## UNITED STATES v. McCOY.
### No. 7180.

Circuit Court of Appeals, Fifth Circuit.
Nov. 22, 1934.

Alex C. Birch, U. S. Atty., and J. E. Meredith, Asst. U. S. Atty., both of Mobile, Ala.

Harry Seale, of Mobile, Ala., and Frank M. Dixon, of Birmingham, Ala., for appellee.

Before BRYAN, HUTCHESON, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

This is an appeal from a judgment in favor of the appellee in a suit brought in June, 1932, on a war risk insurance policy which ceased to be in force on August 31, 1919; the ruling relied on for reversal being the court's refusal to instruct the jury that if they believed the evidence they must find for the defendant.

The complaint alleged that during the life of the policy sued on the appellee became totally and permanently disabled from following continuously any substantially gainful occupation by reason of neurasthenia, diseases and injuries of nervous system, nervousness, diseases and injuries of circulatory system, trench feet, diseases and injuries to feet

and legs, general disability, mental trouble. In the trial evidence as to the cause of appellee's inability to follow gainful occupations continuously was solely with reference to his having trench feet, and to a nervous condition which caused him to collapse or give out when he undertook any strenuous physical exertion. In support of the claim asserted appellee offered his own testimony, that of two physicians, Dr. F. E. Christopher and Dr. C. F. McKinley, that of five lay witnesses, and certified copies of Army records as to his service, and examinations and hospital treatments received while in the Army.

The delay of nearly thirteen years between the lapse of the policy and the bringing of the suit is to be taken as strong evidence that appellee was not totally and permanently disabled before the policy lapsed, unless clear and satisfactory evidence explained, excused, or justified that delay. Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492. In argument for the appellee the suggestion was made that the delay in bringing the suit may be attributed to the delay of the Veterans' Bureau or the Veterans' Administration in acting on appellee's claim under the policy, attention being called to the statute (38 USCA § 445) requiring rejection by that tribunal of the claim asserted before suit on it could be brought. The only basis for that suggestion, and the contention in argument that the claim might have been presented to the Veterans' Bureau many years before the suit was brought, is the absence from the record of any showing as to the date of the presentation of appellee's claim to the Veterans' Bureau or the Veterans' Administration. It being incumbent on the appellee, in order to keep his long-protracted delay in bringing suit on his policy from being taken as strong evidence that he was not totally and permanently disabled before the policy lapsed, to explain, excuse, or justify that delay by clear and satisfactory evidence, a conjecture or surmise, unsupported by proof, that the claim might have been made to the Veterans' Bureau many years before the suit was brought cannot properly be accepted as a substitute for the required clear and satisfactory evidence. There was no allegation or proof explanatory of the delay of nearly thirteen years after the accrual of the asserted claim before the bringing of a suit for the enforcement of it.

No phase of the evidence tended to prove that appellee became totally and permanently disabled by reason of the condition of his feet. It appears from the record that the allegations of the appellee's complaint as to his total and permanent disability and the cause of it were attempted to be supported only by evidence as to his nervous condition and manifestations of it. Evidence without conflict showed that prior to appellee's entry into the Army in May, 1917, when he was twenty-one years of age, he was a robust man, and had been engaged in farming and in the work of hauling logs; that, while serving in the Army in France, in August or September, 1918, foot trouble developed, and appellee was sent successively to several hospitals in France, in which he received treatment for his feet, and then was returned to this country, landing at Ellis Island on November 5, 1918. Soon after his arrival at Ellis Island appellee was sent to a hospital at Fort McPherson, Ga., a copy of a clinical record introduced in evidence by the appellee showing that he entered that hospital on November 17, 1918, and was discharged therefrom and returned to duty on December 13, 1918, the concluding entries in that record being: "Final diagnosis: Convalescent, Trench Feet. Condition on completion of case: Cured." Appellee testified to the following effect: When he was sent back to this country he was "all run down and nervous and his feet were awful bad." When he left the hospital at Fort McPherson he went to a hospital at Camp Merritt, N. J., where he stayed until some time in January, "and was treated for my feet and nervous and heart." He was discharged from that hospital some time in January, 1919; then was put on permanent detachment at Camp Merritt, and remained there until July, when he was sent to Camp Gordon, Ga., for demobilization, and was discharged a few days after his arrival there. After his return to his home he did not do anything for about two weeks. Within thirty days after his return he went to the woods with his brother to get some wood. Soon after he began cutting wood he collapsed, was very weak and nervous, and was laid up for several days. Appellee mentioned several jobs he undertook between the time of his return from the Army and the date of the trial, and which he had to give up because he was unable to do the work. He stated that he worked for a logging company in Florida from August, 1920, until August, 1921, and was paid for the work. He stated: "I was foreman for awhile for the Wilcox Lumber Company at Bollinger on a clear up gang. I had about eight negroes in my charge. I could sit down and did do it. I cannot follow any occupation that requires me to be on my feet all day long. My feet are better now than they have been since I

was discharged, but it comes and goes." (Uncontradicted testimony of C. F. Wilcox, a witness for appellant, showed that that witness was the president of the Wilcox Saw Mill Company, located at Bollinger, that witness employed appellee to work there at a daily wage of $2.50, that appellee began work there on June 13, 1929, and worked there from that date until December 21, 1929, and received his wages for every working day between June 13, 1929, and November 5, 1929.) Appellee was married in January, 1924. He stated: "My wife and me together have done pretty nicely. With her help we have made a living." He has received disability compensation, in amounts from $15 to $47 a month. He stated: "I have used the Government money to buy a home, and with my wife's help to support me and her." When appellee returned from the hospital at Gulfport in July, 1925, his wife had a store, which she started with money furnished by appellee, who helped in the store, waiting on the trade, and he was in that business from July, 1925, until March, 1926. On his cross-examination, upon appellee's attention being called to the following question, answer, and declaration contained in the report of his physical examination prior to separation from service in the Army, appellee stated that he signed that declaration: "Question: Have you any reason to believe that at the present time you are suffering from the effects of any wound, injury or disease, or that you have any disability or impairment of health, whether or not incurred in the military service? Answer. No. I declare that the foregoing questions and my answers thereto have been read over to me, and that I fully understand the questions, and that my replies to them are true in every respect and are correctly recorded. (Signed) Aubrey McCoy." On the same date that declaration was signed, July 10, 1919, the examining surgeon certified that appellee "has this date been given a careful physical examination, and it is found that he is physically and mentally sound."

Dr. Christopher's testimony was to the following effect: Soon after appellee came home from the Army he called witness to treat his feet. Witness then observed that appellee was very nervous. Since 1919 the only treatment witness has given appellee was for his feet, and witness has given appellee some kind of professional advice as often as every six months on an average. Appellee was extremely nervous at times. Witness does not think appellee's nervousness is due to trouble with his feet, and witness does not consider it serious or acute enough to upset his nervous system. Dr. McKinley's testimony was to the following effect: Witness was called to see appellee in the summer of 1920. At that time appellee was very nervous. Appellee then told witness that he had been working on the road, and it was pretty warm weather. At that time appellee was totally disabled, total for the time being. Between that time and the latter part of the year 1923 witness examined the appellee many times, the last time in the latter part of the year 1923. During the time witness was seeing appellee the latter was never able to continuously pursue a gainful occupation. Each of the lay witnesses who were examined in behalf of the appellee testified as to occasions when he had a nervous spell; incidents testified being disabling nervous spells suffered by appellee in the fall of 1919, when he was engaged in the work of baling hay, in the summer of 1920 or 1921 when he was engaged in road work, and several years prior to the trial when he was on hunting or fishing trips. Nothing contained in the Army record introduced in evidence by the appellee indicated that appellee became totally and permanently disabled while the policy sued on was in force. Five physicians testified as witnesses for the appellant, two of them as to examinations of the appellee made soon after the war, one as to an examination of the appellee made in December, 1924, one as to an examination of the appellee made in March, 1926, and two as to examinations of the appellee at different dates in 1931. That testimony negatived the conclusion that appellee was totally and permanently disabled at the times of the several examinations.

Instead of the record showing that appellee, by producing clear and satisfactory evidence that he was totally and permanently disabled while the policy was in force, supported the burden put upon him by his failure to explain or excuse his delay of nearly thirteen years in bringing suit, it appears from the record that there was an absence of any substantial evidence in support of the claim asserted. Neither of the two physicians who were witnesses for the appellee expressed the opinion that he was permanently disabled. Neither of those witnesses testified to any fact or circumstance which reasonably could be regarded as supporting inferences that the nervous condition of the appellee which they observed existed, or was due to a cause which existed, while the policy was in force, or that any disability at any time suffered by the appellee was founded upon conditions which rendered it reasonably certain to continue throughout his life. It was in-

cumbent upon appellee to produce such evidence. Wise v. United States (C. C. A.) 63 F.(2d) 307. In the absence of any evidence tending to prove that the nervous spells suffered by the appellee after the lapse of the policy were due to a cause which existed, with totally disabling effect, while the policy was in force, and that the nervous condition so manifested or the cause of it was such as to render it reasonably certain to have a totally disabling effect throughout his life, the testimony of the appellee that he was all run down and nervous before he was sent back to this country, by itself, or considered in connection with the evidence of his subsequently manifested nervousness, had no tendency to prove that he was totally and permanently disabled while the policy was in force. Not only was there no testimony of a witness shown to be qualified to pass upon the question of the nature and cause of appellee's nervous condition after the lapse of the policy which tended to prove that by reason of that condition appellee became totally and permanently disabled while the policy was in force, but there was no testimony or other evidence furnishing support for that conclusion.

It appearing from the record that the allegations of appellee's complaint as to his becoming totally and permanently disabled while the policy sued on was in force were not supported by any evidence having a substantial tendency to prove those allegations or a material part of them, the ruling complained of was erroneous. Because of that error, the judgment is reversed.